# Exhibit A

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), effective as of January 13, 2025 (the "Effective Date"), by and between Educate, Inc., a Delaware corporation (the "Seller"), and AF Newco I, LLC, a Delaware limited liability company (the "Buyer"). Each of the Buyer and the Seller is referred to herein as a "party" and, collectively, as the "parties."

## RECITALS

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated December 13, 2024, by and between the Seller and the Buyer (as amended, supplemented or modified from time to time, the "Purchase Agreement"), the Buyer has acquired from the Seller certain assets, properties and rights related to the American Freight appliance and furniture retail business (the "Business"), upon the terms and subject to the conditions set forth in the Purchase Agreement;

WHEREAS, in connection with the transactions contemplated by the Purchase Agreement, the Buyer and the Seller desire to enter into this Agreement for the provision of certain services by the Seller to the Buyer; and

WHEREAS, the Seller is willing to provide, or cause to be provided, such services to the Buyer on the terms and conditions set forth herein, and the Buyer is willing to receive such services, in each case, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.  Certain Defined Terms. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.  The following capitalized terms used in this Agreement shall have the meanings set forth below:

"Agreement" shall have the meaning set forth in the Preamble.

"Breaching Party" shall have the meaning set forth in Section 6.02(b).

"Business" shall have the meaning set forth in the Recitals.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Indemnitees" means the Buyer, its Affiliates and its and their respective officers, managers, managing directors, directors, partners, representatives, employees, agents, and equityholders.

"Confidential Information" means, with respect to either party, any and all confidential information and materials, whether in written, verbal, graphic or other form, of such party or any of its Affiliates that is disclosed or made available to the other party or any of its Representatives under or in connection with this Agreement.

"Disclosing Party" means, collectively, either party and any of its Representatives, as applicable, who disclose or make available Confidential Information to a Receiving Party under this Agreement.

"Effective Date" shall have the meaning set forth in the Preamble.

"Force Majeure" means, with respect to a party, an event beyond the control of such party (or any Person acting on its behalf), including acts of God, storms, floods, riots, fires, earthquakes, sabotage, civil commotion or civil unrest, interference by civil or military authorities, riots, insurrections or other hostilities, embargo, fuel or energy shortage, acts of Governmental Bodies (including bank closings, seizures and other actions), acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure or interruption of networks or energy sources, or any epidemics, pandemics, disease outbreaks (including, without limitation, COVID-19 and any associated variants thereof) or other health crisis or public health event, or the worsening of any of the foregoing.

"Losses" means all losses, damages, costs, and expenses actually suffered or incurred by Buyer Indemnitees or Seller Indemnitees, as applicable.

"Migration Services" shall have the meaning set forth in Section 2.09.

"Proceeding" means any civil or criminal judicial, administrative, regulatory or arbitral actions, claims, suits, charges, hearings, complaints, litigation, audits, investigations, inquiries administrative proceedings, condemnation or eminent domain proceedings with respect to any real property, or other proceedings (public or private) commenced, brought, conducted or heard before any Governmental Body or arbitrator or arbitral panel.

"Provider" means the Seller or any Person that the Seller causes to provide one or more Services to one or more Recipients under this Agreement.

"Purchase Agreement" shall have the meaning set forth in the Recitals.

"Receiving Party" means, collectively, either party and any of its Representatives, as applicable, who receives or has access to the Confidential Information of a Disclosing Party under this Agreement.

"Recipient" means the Buyer or any Person that receives any Service on behalf of the Buyer under this Agreement.

"Representative" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, investment bankers or other representatives of such Person.

"Seller" shall have the meaning set forth in the Preamble.

"Seller Indemnitees" means the Seller, its Affiliates and its and their respective officers, managers, managing directors, directors, partners, representatives, employees, agents, and equityholders.

"Service Charge" shall have the meaning set forth in Section 3.01.

"Services" shall have the meaning set forth in Section 2.01.

"Terminating Party" shall have the meaning set forth in Section 6.02(b). "Third Party Consents" shall have the meaning set forth in Section 2.08.

## ARTICLE II

## SERVICES

Section 2.01.   Services.   Subject to the terms and conditions of this Agreement, from and after the Effective Date and for the periods set forth in Schedule 2.01 attached hereto (as such periods may be earlier terminated pursuant to Section 6.01), the Seller shall provide (or cause to be provided) to Recipient the services set forth in Schedule 2.01 attached hereto (the "Services"); provided that, notwithstanding anything to the contrary herein, the Seller shall not be obligated to (and shall not be obligated to cause any Provider to) provide any Services if the provision of such Services would violate any Law to which the Seller or any Affiliate thereof is subject.

Section 2.02.   Standard of the Provision of Services.   The Seller shall provide, and cause each other Provider to provide, the Services in a commercially reasonable manner with a substantially similar standard of care, skill and diligence, and in a substantially similar manner, priority and timeframe(s), as services were provided to the Business immediately prior to the Effective Date.  In furtherance of and addition to the foregoing, Provider shall perform the Services (i) with reasonable care and in a workmanlike manner and (ii) in material compliance with applicable federal, state, provincial and local Laws.

Section 2.03.   Change in Services.   Subject to the compliance with the service standard set forth in Section 2.02, each Provider may, from time to time, reasonably supplement, modify, substitute or otherwise alter the Services provided by it in a manner that does not materially affect the quality or availability of such Services; provided, however, that any such modification, change or enhancement may not be undertaken with the intent or purpose of disadvantaging Recipient.

Section 2.04. Personnel.  The Seller shall have the right, in its reasonable discretion, to (a) designate which personnel it will assign to perform any Service and (b) remove and replace such personnel at any time.  In performing their respective duties hereunder, all personnel of any Provider shall be under the direction, control and supervision of the Seller, and the Seller shall have the sole right to exercise all authority with respect to the employment (including termination

3

of employment), assignment and compensation of such personnel.  The Seller shall be and remain responsible for the compliance of its personnel and the personnel of any other Person providing Services hereunder with the terms and conditions of this Agreement.

Section 2.05.   Cooperation. The Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to (a) cooperate with the Seller and its Affiliates with respect to the provision of any Service and (b) enable the Seller and its Affiliates to provide the Services in accordance with this Agreement.  Neither the Buyer nor its Affiliates shall take any action that would be reasonably expected to interfere with or increase the cost of the Seller in providing any of the Services or causing any of the Services to be provided.  Further, the Buyer and its Affiliates shall use commercially reasonable efforts to provide to the Seller or other relevant Provider(s) such information and documentation as is sufficient for each Provider to perform the Services in the manner they were provided in the ordinary course immediately prior to the Effective Date.

Section 2.06.   Electronic and Other Access; Security Procedures.

(a)    The parties shall use commercially reasonable efforts, to the extent applicable to the Services, to comply with, and ensure that its applicable networks and computer systems comply with, any security (including physical security, internet security and personal data security), access, use, virus protection, disaster recovery, confidentiality and other policies, procedures and limitations of Provider, as they may be amended from time to time.

(b)    The parties shall, to the extent applicable to the Services, use commercially reasonable efforts to ensure that Provider is able to maintain or exceed its current level of security with respect to all of its facilities, networks and systems used in connection with the Services and all of the data contained therein throughout the term of this Agreement.

(c)    While Services are being provided hereunder, Provider and Recipient shall, to the extent applicable to the Services, take commercially reasonable measures to ensure that, in connection with the provision of any Services, no virus or similar items are coded or introduced into either its own (including its Affiliates) or any other Provider or Recipient (including its Affiliates) computer networks or databases.  If, in connection with the provision of any Services, a virus is found to have been introduced into such computer networks or databases, each party shall notify the other party in writing and shall use commercially reasonable efforts to cooperate and to diligently work together with the other party to eliminate the effects of such virus. Each Recipient shall exercise commercially reasonable care to prevent unauthorized Persons from accessing the computer and technology systems or networks of any of the Providers to which Recipient has access in connection with the Services, if any.

Section 2.07.  Limitations.  Notwithstanding anything to the contrary in this Agreement, the Seller shall not have any obligation under this Agreement to: (a) provide or cause to be provided to any Recipient any services, functions, support or resources that are not consistent with the ordinary course of operation of the Business by the Seller or its Affiliates immediately prior to the Effective Date; (b) advance any funds or make any capital expenditures in order to

provide the Services; (c) perform or cause to be performed any Service for the benefit of any Person other than Recipient; (d) implement systems, processes, technologies, software, hardware, plans or initiatives developed, acquired or used by any Provider or any Recipient after the Effective Date; or (e) provide Services other than in connection with the operation of the Business and subject to the other terms and conditions of this Agreement. Recipient shall not use the Services other than in connection with the operation of the Business as conducted by the Buyer after the Effective Date, and Recipient may not resell, license or otherwise permit the use by others of any Services received from any Provider.

Section 2.08. <u>Third Party Consents</u>. The Seller's obligations to provide, or cause to be provided, any Service described in this Agreement are conditional upon the Seller and/or the Buyer (or the applicable Affiliate of the Seller or the Buyer) obtaining the applicable consent, license or approval of any third party (including, but not limited to, any Governmental Body) required for the provision of the Services (the "<u>Third Party Consents</u>"); <u>provided</u> that if such Third Party Consent has not been obtained or cannot be obtained or maintained using the Seller's and the Buyer's commercially reasonable efforts, the parties shall use their commercially reasonable efforts to (i) negotiate in good faith to develop acceptable alternative work-around arrangements for the provision of the Service, and (ii) arrange for commercially reasonable alternative methods of delivering such Service in a manner and to the extent that provision of the Services does not result in a breach, violation, infringement, default or noncompliance with Law or any contract. Notwithstanding the foregoing, where the provision of any Third Party Consent is conditioned on the third party receiving a fee or other payment for such Third Party Consent, the Seller or the Buyer, as applicable, shall obtain such Third Party Consent at the Buyer's sole cost and expense. In no event shall the Seller be obligated to provide, or cause to be provided, any Services to which such Third Party Consent relates until such Third Party Consent has been obtained (unless the parties have agreed on alternative as contemplated in this <u>Section 2.08</u>).

Section 2.09. <u>Migration</u>. As part of the Services provided under this Agreement, during the periods set forth in <u>Schedule 2.01</u>, the Seller agrees to use, and to cause its Affiliates to use, and the Buyer agrees to use, and to cause its Affiliates to use, its commercially reasonable efforts to cooperate with and assist each other in connection with the migration from the performance of any Service by a Provider to the performance of such Service by the Buyer or a third Person ("<u>Migration Services</u>"), taking into account the need to minimize both the cost of such migration and the disruption to the ongoing business activities of each party.

## ARTICLE III

## COSTS AND DISBURSEMENTS

Section 3.01. <u>Service Charges</u>. As consideration for providing the Services, the Buyer shall pay, or shall cause to be paid, to the Seller the amount specified next to each Service set forth in <u>Schedule 2.01</u> (each such charge, a "<u>Service Charge</u>"). Each month's Service Charges (pro-rated if applicable to less than a full calendar month) shall be invoiced monthly in advance and paid via electronic funds transfer (instructions to be separately provided), to the Seller within thirty (30) days of receipt of each such invoice.

Section 3.02. <u>Taxes</u>.

(a)     The Seller shall be entitled to charge and collect, or cause to be charged and collected, from the Buyer an additional amount equal to all state, local and/or foreign sales tax, value added tax or any other similar tax with respect to the provision of any Services provided by the Seller or another Provider hereunder and shall timely remit such taxes to the appropriate tax authorities.

(b)     Any payment to the Seller (or another Provider) made hereunder shall be made free and clear of any deduction or withholding for tax (if any) and in the event that any deduction or withholding for tax is required, the Buyer shall pay additional amounts to the Seller (or the applicable Provider) so that, after such deduction or withholding, the Seller (or such Provider) receives the same amount that it would have received but for such deduction or withholding.  The Buyer shall timely remit such deduction or withholding for tax to the appropriate taxing authority and provide the Seller with a receipt confirming such payment.  The Seller shall reasonably cooperate with the Buyer to minimize applicable withholding taxes (e.g., by providing tax residency certificates and other documents required under a certain tax treaty to obtain the benefit of a lower withholding rate).  If the Buyer is exempt from any such taxes, the Buyer shall furnish the Seller with a valid and properly completed resale, exemption or other certificate, as required under applicable Law.

Section 3.03.  <u>Late Charges</u>. Any amount required to be paid under this <u>Article III</u> and not paid by the tenth (10th) day following the due date for payment shall be subject to penalty interest of one and one-half percent (1.5%) per month, calculated from the date on which the payment was due to and including the date of payment.

Section 3.04.  <u>No Right of Setoff</u>.  Each of the parties hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to the other party, whether under this Agreement, the Purchase Agreement or otherwise, against any other amount owed (or to become due and owing) to it by the other party.

**ARTICLE IV**

**WARRANTIES AND COMPLIANCE**

Section 4.01.  <u>Disclaimer of Warranties</u>. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE SELLER EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE.

Section 4.02.  <u>Compliance with Laws and Regulations</u>.  Each party shall be responsible for its own compliance with any and all Laws applicable to the performance of its obligations under this Agreement.

**ARTICLE V**

**INDEMNIFICATION AND LIMITED LIABILITY**

Section 5.01.  <u>Indemnity</u>.

(a)      Subject to the limitations set forth in this <u>ARTICLE V</u> and <u>Section 7.01</u>, the Buyer hereby agrees, at all times during the term of this Agreement and thereafter, to indemnify the Seller Indemnitees against, and defend and hold such Persons harmless from, any and all Losses arising out of or in connection with the performance of the Services, including any suit, action or other Proceeding brought by a third Person arising from or in connection with the performance of the Services; <u>provided</u>, <u>however</u>, that the Buyer shall not be required to indemnify any Seller Indemnitee against any Losses to the extent that they resulted from the gross negligence, fraud or wilful and intentional breach by the Seller or any other Provider in providing the Services hereunder, as determined in a final and non-appealable judgment of a court of competent jurisdiction.

(b)      Subject to the limitations set forth in this <u>ARTICLE V</u> and <u>Section 7.01</u>, the Seller hereby agrees, at all times during the term of this Agreement and thereafter, to indemnify the Buyer Indemnitees against, and defend and hold such Persons harmless from, any and all Losses arising out of or in connection with the performance of the Services, including any suit, action or other Proceeding brought by a third Person and arising from or in connection with the performance of the Services, but in each case only if any such Loss arises out of or in connection with the gross negligence, fraud or wilful and intentional breach by the Seller or any other Provider in providing the Services hereunder, in each case as determined in a final and non- appealable judgment of a court of competent jurisdiction.

Section  5.02.  <u>Additional  Limitations  on  Liability</u>.  NOTWITHSTANDING ANYTHING  CONTAINED  HEREIN  TO  THE  CONTRARY,  NO  PARTY,  NOR  ANY PROVIDER  NOR  ANY  OF  THEIR  RESPECTIVE  AFFILIATES  OR  ITS  OR  THEIR REPRESENTATIVES  (NOR  ANY  SUCCESSORS  OR  ASSIGNS  OF  SUCH  PERSONS) SHALL  BE  LIABLE  FOR  ANY  INCIDENTAL,  SPECIAL,  INDIRECT,  EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF PROFIT OR LOSS OF  REVENUE)  OF  THE  OTHER  PARTY,  ITS  SUCCESSORS,  ASSIGNS  OR  THEIR RESPECTIVE  AFFILIATES  AND  REPRESENTATIVES,  IN  ANY  WAY  DUE  TO, RESULTING  FROM  OR  ARISING  IN  CONNECTION  WITH  THIS  AGREEMENT, REGARDLESS  OF  WHETHER  SUCH  LIABILITY  ARISES  IN  TORT  (INCLUDING NEGLIGENCE),  CONTRACT,  BREACH  OF  WARRANTY,  STRICT  LIABILITY, INDEMNIFICATION OR OTHERWISE AND REGARDLESS OF WHETHER ANY SUCH DAMAGES ARE FORESEEABLE OR WHETHER AN INDEMNIFIED PERSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, IN NO EVENT WILL SELLER AND ITS AFFILIATES'  MAXIMUM  AGGREGATE  LIABILITY  FOR  ANY  AND  ALL  LOSSES ARISING  OUT  OF  OR  IN  CONNECTION  WITH  THIS  AGREEMENT  OR  ITS TERMINATION OR EXPIRATION, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM  BASED  ON  CONTRACT,  WARRANTY,  TORT,  FAILURE  OF  ESSENTIAL PURPOSE, TRADE USAGE OR OTHERWISE, EXCEED THE AGGREGATE AMOUNT OF

THE SERVICE CHARGES PAID TO THE SELLER UNDER THIS AGREEMENT.

Section 5.03.  Insurance.  Notwithstanding anything to the contrary contained herein, no party shall be entitled to be indemnified under this ARTICLE V for any Losses to the extent that such Losses are actually recovered from a third-party insurance provider, and the parties shall, or shall cause the applicable Affiliate thereof to, use commercially reasonable efforts to access and recover pursuant to any such insurance.  If any amounts are paid by an indemnifying party hereunder and thereafter insurance payments are made to an indemnified party or any Affiliate thereof in respect of the matter giving rise to such indemnification payment, the recipient of such insurance payment shall pay over any such insurance recoveries (excluding self-insurance) to the indemnifying party up to the amount of the indemnification payment so made.

## ARTICLE VI

## TERM AND TERMINATION

Section 6.01.  Term and Termination of Services.

(a)    Each Service shall be provided for a term commencing on the Effective Date and ending on the date set forth with respect to such Service in Schedule 2.01, as applicable, or such shorter term if earlier terminated pursuant to the terms of this Agreement.

(b)    With respect to any Service (including any Service as supplemented, modified, substituted or otherwise altered pursuant to and in accordance with the terms of Section 2.03):

(i)  the Buyer may terminate such Service for any reason or no reason, upon at least thirty (30) days' prior written notice to the Seller (unless a longer notice period is specified in Schedule 2.01);

(ii) either party may terminate such Service (A) immediately upon the non-terminating party's receipt of written notice, if the continued performance of such Service by the Terminating Party would be a violation of any applicable Law or (B) as provided in Section 6.02;

(iii)    such Service may be terminated at any time upon mutual written agreement of the parties; and

(iv)    such Service shall automatically terminate upon the termination of any Contract by the Seller or its Affiliates in conjunction with the Chapter 11 Cases if such terminated Contract is related to and necessary for the provision of such Service. Notwithstanding anything to the contrary in this Agreement and Schedule 2.01, the Buyer hereby agrees that the Seller and its Affiliates shall have the right to terminate any Contract related to any Service in conjunction with the Chapter 11 Cases.

Section 6.02.  Termination of Agreement.

(a)    This Agreement shall terminate on the earliest to occur of (i) the latest date on which Services are to be provided as indicated in Schedule 2.01, (ii) the date on which the provision of all Services has terminated or been cancelled pursuant to Section 6.01, (iii) the date on which this Agreement is terminated pursuant to Section 6.02(b) or Section 6.02(c), as applicable.

(b)    Notwithstanding the term for providing any Service as set forth in Schedule 2.01, this Agreement may be terminated earlier (i) by either party (the "Terminating Party") if the other party (the "Breaching Party") is in material breach of its covenants or agreements under this Agreement and fails to cure such breach within five (5) days of the Breaching Party's receipt of a written notice of such breach from the Terminating Party describing the nature of such breach in reasonable detail or (ii) by the Seller if the Buyer commences a voluntary case or other Proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other Proceeding commenced against it, or makes a general assignment for the benefit of creditors or takes any corporate action to authorize any of the foregoing.

(c)    This Agreement shall automatically terminate upon termination of the Purchase Agreement.

Section 6.03.  Effect of Termination.

(a)    If any Service is terminated in accordance with this Agreement, all other Services that are dependent on such terminated Service shall also terminate, and Schedule 2.01 shall be updated to reflect such termination.  Upon termination of any Service in accordance with this Agreement or upon termination of this Agreement, (i) the Seller will have no further obligation to provide such terminated Service or cause such terminated Service to be provided hereunder, and (ii) the Buyer shall have no obligation to pay any Service Charges relating to any such Service in respect of periods following the effective date of such termination except as otherwise expressly set forth in Schedule 2.01; provided, however, that the Buyer shall remain obligated to pay to the Seller any Service Charges owed and payable in respect of any Service that was provided prior to the effective date of such termination.  In connection with the termination of any Service, the provisions of this Agreement not relating solely to such terminated Service shall survive any such termination.

(b)    In connection with any termination or expiration of this Agreement pursuant to Section 6.02, the provisions of ARTICLE I, ARTICLE III, ARTICLE V, ARTICLE VIII, Section 6.02 and this Section 6.03 shall survive the termination or expiration of this Agreement.  The termination of this Agreement shall not relieve any party of any liability or obligations arising hereunder prior to such termination.

**ARTICLE VII**

9

**FORCE MAJEURE**

Section 7.01. <u>Effect of Force Majeure</u>.  No party shall have any liability or responsibility for any interruption, delay or other failure to fulfill any obligation under this Agreement, so long as and to the extent to which the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of a Force Majeure; <u>provided</u> that such party shall have exercised commercially reasonable efforts to minimize the effect of a Force Majeure on its obligations.  In the event of an occurrence of a Force Majeure, the party whose performance is affected thereby shall give notice (orally and in writing) of suspension as soon as reasonably practicable to the other party, stating the date and extent of such suspension and the cause thereof, and such party shall resume the performance of such obligations as soon as reasonably practicable upon the cessation of such Force Majeure and its effects.  Notwithstanding the foregoing, the occurrence of a Force Majeure event shall not relieve any party of its payment obligations hereunder.

Section 7.02. <u>Affected Services</u>.  If a Force Majeure shall continue to exist for more than thirty (30) consecutive days, the party whose performance is not affected by such Force Majeure shall be entitled to permanently terminate the Services affected.  The Buyer shall be relieved of the obligation to pay any Service Charges for the provision of the affected Services throughout the duration of such Force Majeure.

**ARTICLE VIII**

**GENERAL PROVISIONS**

Section 8.01. <u>Treatment of Confidential Information</u>.  No party shall, and each party shall cause its Providers and Representatives that are providing or receiving Services or that otherwise have access to Confidential Information of the Disclosing Party not to, disclose or make available to any other Person or use, except as required to perform its obligations under this Agreement, any Confidential Information of the Disclosing Party; <u>provided</u>, <u>however</u>, that each party may disclose (subject to applicable Law) Confidential Information of the Disclosing Party to Providers and Recipients and their respective Representatives, in each case who (x) require such information in order to perform their duties in connection with this Agreement and (y) have agreed to use and to maintain the confidentiality of such information, in each case, consistent with the terms hereof; and <u>provided</u>, <u>further</u>, that the Receiving Party may disclose (subject to applicable Law) Confidential Information of the Disclosing Party if (i) any such Confidential Information (including any report, statement, testimony or other submission to a Governmental Body) is required by applicable Law or such Governmental Body to be disclosed, or (ii) any such Confidential Information is reasonably necessary to be disclosed in connection with any Proceeding or in any dispute with respect to this Agreement (including in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the Receiving Party in the course of any litigation, arbitration, mediation, investigation or administrative Proceeding); <u>provided, however</u>, in each case that Disclosing Party shall, to the extent permitted by applicable Law, give advance written notice of such compelled disclosure to the other party, and shall cooperate with the non-disclosing party in connection with any efforts to prevent or limit the scope of such disclosure.  Notwithstanding the foregoing, "<u>Confidential</u>

Information" shall not include (A) information of the Disclosing Party that is or becomes generally available to the public other than as a result of a breach of this Agreement by the Receiving Party or (B) any information that was or becomes available to the Receiving Party on a non-confidential basis and from a source (other than a party to this Agreement or any Representative of such party) that is not bound by a confidentiality agreement with respect to such information.

Section 8.02. <u>Notices</u>. Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other party shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by e-mail transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

if to the Buyer, to

AF Newco I, LLC
Attention: Michael Piper
E-mail: mp@velocityrecoveries.com

with a copy (which shall not constitute effective notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Attention: Andrew Behlmann
Email: abehlmann@lowenstein.com


if to the Seller, to

Educate, Inc.
c/o Franchise Group, Inc.
109 Innovation Court, Suite J, Delaware, Ohio 43015
Attention: Tiffany McMillan-McWaters
Email: tmcwaters@Franchisegrp.com
with a copy to (which shall not constitute notice):

Willkie Farr & Gallagher LLP
787 Seventh Avenue New York, NY 10019
Attention: Debra Sinclair, Matthew A. Feldman, Russell Leaf, Thomas Mark and Jeffrey Daniel
Email: dsinclair@willkie.com; mfeldman@willkie.com; rleaf@willkie.com; tmark@willkie.com; and jdaniel@willkie.com

Or to such other Persons, addresses, or e-mail addresses as may be designated in writing from time to time by the party to receive such notice.

Section 8.03.  <u>Amendment and Waiver</u>.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party, or in the case of a waiver, by the party against whom the waiver is to be effective. No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

Section 8.04.  <u>Assignment</u>.  This Agreement shall be binding upon the Buyer and, subject to entry of the Sale Order, the Seller, and inure to the benefit of the parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case and any reorganized Seller. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Seller or the Buyer (by operation of Law or otherwise) without the prior written consent of the other party and any attempted assignment without the required consents shall be void; <u>provided</u>, <u>however</u>, that the Seller may assign this Agreement to a liquidating trust or similar vehicle under a Chapter 11 plan in the Chapter 11 Cases without consent of the Buyer.

Section 8.05.  <u>Entire Agreement</u>.  This Agreement and the Purchase Agreement (including all exhibits, schedules and annexes hereto and thereto) represent the entire understanding and agreement between the parties with respect to the subject matter hereof.

Section 8.06.  <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Governmental Body declares that any term or provision hereof is invalid, illegal or unenforceable, the parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 8.07.  <u>No Third-Party Beneficiaries</u>.  Except as set forth in <u>ARTICLE V</u> with respect to the Seller Indemnitees and the Buyer Indemnitees, this Agreement is for the sole benefit of the parties and their respective successors and permitted assigns, and nothing in this Agreement will create or be deemed to create any third-party beneficiary rights in any Person, other than the parties and such successors and permitted assigns (including, for the avoidance of doubt, any chief restructuring officer or similar officer administering the Seller's assets in the Chapter 11 Case).

Section 8.08.  No Agency.  Nothing in this Agreement shall be deemed in any way or for any purpose to constitute any party acting as an agent of another unaffiliated party in the conduct of such other party's business, or as creating any type of partnership, joint venture or fiduciary relationship between or among the parties.  Any Provider of any Service hereunder shall act as an independent contractor and not as the agent of any Recipient or its Affiliates in performing such Service.  To the fullest extent permitted by applicable Law, this Agreement is not intended to, and does not, create or impose any fiduciary duties on either party with respect to the other, or their respective officers, managers, board members, equity holders, agents or other Representatives.  Further, to the fullest extent permitted by applicable Law, each party hereby waives any and all fiduciary duties that, absent such waiver, may be implied by law or in equity, and in doing so, recognizes, acknowledges and agrees that each party's duties and obligations to the other are only as expressly set forth in this Agreement.

Section 8.9.  Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which when taken together will constitute one and the same instrument.  The delivery of executed signature pages by the parties hereto by email transmission of .pdf signatures or other electronic copies of signatures will be deemed to have the same effect as the delivery of the original copies of the executed signature pages.

Section 8.10. Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, IN EACH CASE WITHOUT REFERENCE TO ANY CONFLICTS OR CHOICE OF LAW RULE OR PRINCIPLE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT MIGHT OTHERWISE REFER CONSTRUCTION OR INTERPRETATION OF THIS AGREEMENT TO THE SUBSTANTIVE LAW OF ANOTHER JURISDICTION.

Section 8.11.  Consent to Jurisdiction.  The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court for any action, suit, or Proceeding (other than appeals therefrom) arising out of or relating to this Agreement, and agree not to commence any action, suit or Proceeding (other than appeals therefrom) related thereto except in such court. The parties further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or Proceeding (other than appeals therefrom) arising out of or relating to this Agreement in the Bankruptcy Court, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or Proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. Notwithstanding the foregoing consent to Bankruptcy Court jurisdiction, in the event the Seller's Chapter 11 Cases are closed or the Bankruptcy Court otherwise declines to exercise jurisdiction over the parties or any dispute arising out of or related to this Agreement, any litigation arising out of or relating to this Agreement shall be heard and determined exclusively in the federal and state courts in the State of Delaware, and the parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such litigation and irrevocably waive the defense of any inconvenient forum to the maintenance of any such litigation.

Section 8.12. <u>Waiver of Jury Trial</u>. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.13. <u>Rules of Interpretation</u>. The rules of interpretation set forth in Section 11.15 of the Purchase Agreement will apply to this Agreement *mutatis mutandis*.

[*REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK*]

**IN WITNESS WHEREOF,** each of the Buyer and the Seller have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**BUYER:**

AF Newco I, LLC

By: 

Name: Michael S. Piper

Title: Managing Member

**SELLER:**

Educate, Inc.

By: _____

Name:

Title:

*[Signature Page to Transition Services Agreement]*

**IN WITNESS WHEREOF**, each of the Buyer and the Seller have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**BUYER:**

AF Newco I, LLC

By: _____
Name:
Title:

**SELLER:**

Educate, Inc.

By: *Andrew Kaminsky*
913FEB95E8CD4CC...
Name: Andrew Kaminsky
Title: Vice President

**SCHEDULE 2.01**

**SERVICES**

| Service | Initial Service Period | Key Personnel | Service Cost per Month (Payable by Recipient to Franchise Group, Inc.) |
|---|---|---|---|
| **I. HEALTH AND BENEFITS** | | | |
| The Seller and its Affiliates will provide benefits and related administration (the "Benefits Services"). The below constitutes the scope of the Benefits Services, unless otherwise required by applicable Law:<br><br>(i)   Continuation of medical, dental, vision, pharmacy, health spending accounts, flexible spending accounts and short-term disability coverage, life insurance, accidental death and dismemberment, long-term disability / critical illness, employee assistance program, voluntary hospital indemnity, critical illness, accident and legal;<br><br>(ii)   Continuation of all benefits administration including deduction calculations, benefit elections, family status change administration, beneficiaries, dependent administration, premium and billing, COBRA and benefits compliance-related matters.<br><br>For the sake of clarity, the provision of payroll services and any administrative services related thereto will not constitute Services provided to Recipient. | Service period not to exceed April 30, 2025. | Andrew Kaminsky | Reimbursement for (a) all premiums for the benefits provided hereunder as part of the Benefit Services, and (b) all costs and expenses incurred by the Seller and its Affiliates which exceed the premiums for the benefits provided hereunder as part of the Benefit Services. Reimbursement pertains only to those associates who are employees for the Buyer, and for avoidance of doubt, this does not include any COBRA related claims.<br><br>There will be no fee for the compensation of Seller's employees who are providing the Benefits Services. In the event that the Seller or its Affiliates need to hire any additional employees or consultants to support the Benefits Services, the Buyer shall be responsible for reimbursing the compensation of all such additional employees or consultants. |

| Service | Initial Service Period | Key Personnel | Service Cost per Month (Payable by Recipient to Franchise Group, Inc.) |
|---|---|---|---|
| **II.  SOFTWARE LICENSES  AND IT SERVICES & SUPPORT** | | | |
| The Seller and its Affiliates will provide IT software, licenses and systems access to enable continued utilization of services provided via existing American Freight contracts (the "IT Services").  This includes but is not limited to Point-of-Sale, D365, Relex, Concur, UKG, MicroStrategy, Microsoft Office, Granite, Ring Central, Vertex, Freedom Pay, Coyote, AFF User Portal, OneRail User Portal, Capturis, Yext, Varis, and others as agreed upon by both parties. | Service period not to exceed April 30, 2025. | Andrew Kaminsky Brian Simpkins | Reimbursement of all costs and expenses incurred by the Seller and its Affiliates (excluding current labor/staff) in connection with the IT Services required by Recipient, and in excess of other costs associated with the IT Services for the Seller and its Affiliates .  For the sake of clarity, any base fees that the Seller and/or its Affiliates may incur for the IT Services that are not being utilized by the Seller and/or its Affiliates will be paid for by the Buyer.  Otherwise, the Buyer will only be responsible for incremental fees and expenses of the IT Services. |
| **III. NETWORKING AND COMMUNICATIONS SUPPORT** | | | |
| The Seller and its Affiliates will provide networking and communications support via Granite, Ring Central, and American Freight IT resources (the "Networking and Communication Services"). | Service period not to exceed April 30, 2025. | Andrew Kaminsky Brian Simpkins | Reimbursement of all costs and expenses incurred by the Seller and its Affiliates (excluding current labor/staff) in connection with the Networking and Communications Services required by Recipient, and in excess of other costs associated with the Networking and Communications Services for the Seller and its Affiliates.  For the sake of clarity, any base fees that the Seller and/or its Affiliates may incur for the Networking and Communications Services that are not being utilized by the Seller and/or its Affiliates will be paid for by the Buyer.  Otherwise, the Buyer will only be responsible for incremental fees and expenses of the Networking and Communications Services. |
| **IV. PAYROLL PROCESSING & SUPPORT** | | | |
| The Seller and its Affiliates will provide HR support for payroll management and payroll processing (the "HR Services"). | Service period not to exceed April 30, 2025. | Andrew Kaminsky Philip Etter | Reimbursement of all costs and expenses incurred by the Seller and its Affiliates (excluding current labor/staff) in connection with the HR Services required by Recipient, and in excess of other costs associated with the HR |

| | | | Services for the Seller and its Affiliates. For the sake of clarity, any base fees that the Seller and/or its Affiliates may incur for the HR Services that are not being utilized by the Seller and/or its Affiliates will be paid for by the Buyer. Otherwise, the Buyer will only be responsible for incremental fees and expenses of the HR Services. |
|---|---|---|---|
| **V. LEASE & CONTRACT ADMINISTRATION SUPPORT** | | | |
| The Seller will cause American Freight to continue to offer the Buyer access to the ASG (Lease Administration) system and the contract logix systems. Access will be limited to information necessary for the Buyer housed in these systems (the "Lease and Contract Administration Services"). | Service period not to exceed April 30, 2025. | Andrew Kaminsky Donna Taucher Chuck Jennings | Reimbursement of all costs and expenses incurred by the Seller and its Affiliates (excluding current labor/staff) in connection with the Lease and Contract Administration Services required by Recipient and in excess of other costs associated with the Lease and Contract Administration Services for the Seller and its Affiliates. For the sake of clarity, any base fees that the Seller and/or its Affiliates may incur for the Lease and Contract Administration Services that are not being utilized by the Seller and/or its Affiliates will be paid for by the Buyer. Otherwise, the Buyer will only be responsible for incremental fees and expenses of the Lease and Contract Administration Services. |
| **VI. FINANCIAL SERVICES** | | | |
| The Seller will cause American Freight to continue to offer (i) the Buyer access to the freedom pay payment gateway credit card processing through the POS integration and (ii) credit card settlement via the chase bank cardholder agreement (collectively and including the below, the "Financial Services").    (i) The Seller will cause American Freight to remit funds for sales transactions processed in the Buyer store locations. | Service period not to exceed April 30, 2025. | Andrew Kaminsky Brian Simpkins Jeff Seghi | Reimbursement of all costs and expenses incurred by the Seller and its Affiliates (excluding current labor/staff) in connection with the Financial Services required by Recipient, and in excess of other costs associated with the Financial Services for the Seller and its Affiliates. For the sake of clarity, any base fees that the Seller and/or its Affiliates may incur for the Financial Services that are not being utilized by the Seller and/or its Affiliates will be paid for by the Buyer. Otherwise, the Buyer will only be responsible for incremental fees and expenses of the Financial Services.<br><br>In addition, the Buyer will be financially |

| | | | responsible for all credit card chargebacks in their assigned locations after the Effective Date. |
|---|---|---|---|
| **VII. BUSINESS LICENSING, PERMITTING & TAX FILING** | | | |
| The Seller and its Affiliates will continue to offer the Buyer business licensing, permitting, and tax filing services consistent with the manner offered previously (the "<u>Business Licensing, Permitting and Tax Filing Services</u>"). | Service period not to exceed April 30, 2025. | Andrew Kaminsky | Reimbursement of all costs and expenses incurred by the Seller and its Affiliates (excluding current labor/staff) in connection with the Business Licensing, Permitting and Tax Filing Services required by Recipient, and in excess of other costs associated with the Business Licensing, Permitting and Tax Filing Services for the Seller and its Affiliates. |